**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1032.  THE STATE v. PHILLIPS et al.

MCMILLIAN, Justice.

Following the death of Fernando Rodriguez while he was being subdued by law enforcement officers, a Henry County grand jury jointly indicted the officers for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on violation of oath by public officer (Count 3), aggravated assault (Count 4), and each separately with violation of oath by public officer (Counts 5-9).  The State appeals the trial court's grant of the officers' general demurrer to Count 3, which concluded that violation of oath by public officer is not an inherently dangerous felony and therefore cannot serve as a predicate felony to support a charge of felony murder.  For the reasons that follow, we

vacate the trial court's order and remand for the court to consider in the first instance the asserted grounds for demurrer it has not yet ruled upon.

1. Based on the representations of the parties and other record information available at this stage of the proceedings, it appears that on September 20, 2019, Mason Lewis, Marcus Stroud, and Gregory Bowlden of the Hampton Police Department responded to a disturbance call along with Henry County Police Department officers Quinton Phillips and Robert Butera. When officers arrived around 10:00 p.m., they encountered 24-year-old Rodriguez, who was nude in the middle of the road. According to the officers, Rodriguez then engaged in a prolonged struggle with the officers—ignoring commands to roll over so he could be handcuffed, swinging and kicking at the officers, screaming, biting, and generally resisting arrest and attempting to evade the officers. After determining that they could not safely transport Rodriguez in a police car, officers called for an ambulance so they could secure him to a stretcher for transport and medical evaluation. While waiting

2

for the ambulance to arrive, two officers secured Rodriguez's hands, other officers secured his legs, and another placed his knee across the back of Rodriguez's shoulders, applying pressure to keep him down and subdued. Though the officers state that they checked to ensure Rodriguez was breathing shortly before EMS arrived, EMS found that Rodriguez was no longer breathing sufficiently, and he later died at the hospital.

The officers were indicted on November 19, 2021, for malice murder, felony murder predicated on aggravated assault, felony murder predicated on violation of oath by public officer, aggravated assault, and violation of oath by public officer. This appeal centers on Count 3, charging the officers with felony murder predicated on violation of their oaths by asphyxiating Rodriguez. In full, Count 3 reads:

> And the Grand jurors, aforesaid, in the name and on behalf of the citizens of Georgia, further charge and accuse Mason Lewis, Marcus Stroud, Quinton Phillips, Robert Butera and Gregory Bowlden, individually and as a party concerned in the commission of a crime, with the offense of FELONY MURDER (O.C.G.A. 16-5-1), in that the said accused in the State and County aforesaid, on the

3

20th day of September, 2019, while in the commission of the offense of Violation of Oath by Public Officer, a felony, did cause the death of Fernando Rodriguez, a human being, by asphyxiating him, contrary to the laws of said State, the peace, good order, and dignity thereof.

Counts 5-9, charging the officers with violation of their respective oaths under OCGA § 16-10-1,[1] alleged that the officers:

being [ ] public officer[s] … who swore to protect and serve the citizens … in a courteous and professional manner and to support the Constitution of the United States and the State of Georgia, did willfully and intentionally violate the terms of [their] oath as prescribed by law, by

---

[1] The version of OCGA § 16-10-1 in effect at the time the officers were indicted provided in full: "Any public officer who willfully and intentionally violates the terms of his oath as prescribed by law shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years." OCGA § 16-10-1 was amended, effective July 1, 2025, and now provides in full:

> (a) Any public officer who willfully and intentionally violates the terms of his or her oath as prescribed by law shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.
>
> (b) Any peace officer, as such term is defined in Code Section 35-8-2, who has sworn the oath or oaths prescribed in Code Sections 15-16-4 and 45-3-7 shall be subject to prosecution under this Code section only for violations of such oath or oaths as prescribed.
>
> (c) No individual shall be subject to prosecution for violation of his or her oath of office under this Code section, except where such violation is predicated upon the commission of a felony or a misdemeanor of a high and aggravated nature.

4

asphyxiating Fernando Rodriguez by stretching out Fernando Rodriguez on the ground in a prone position, holding him down and applying pressure to his body, contrary to the laws of said State, the peace, good order, and dignity thereof.

The officers filed various general and special demurrers to the indictment. After hearing argument, the trial court entered orders granting the officers' general demurrer to Count 3 and later entered separate orders denying Lewis and Phillips's special demurrer to the entire indictment and denying the officers' special demurrer to the violation of oath of office counts.[2] Importantly, it appears that the trial court has not yet ruled on general demurrers to Counts 3 and 5 through 9 on the ground that those Counts do not adequately allege the crime of violation of oath by public officer as neither the record in this appeal nor the exhibits provided in connection with Lewis's, Phillips's, and Butera's applications for interlocutory

---

[2] This Court previously denied Lewis's, Phillips's, and Butera's applications for interlocutory appeal of those denials. See *Lewis v. State*, S25I0483; *Phillips v. State*, S25I0487; *Butera v. State*, S25I0489 (all denied Jan. 8, 2025) (Peterson, P.J., dissenting).

5

appeal contain such an order.[3]  The substantive part of the order granting the general demurrer to Count 3 reads in full:

> In support of its ruling, the Court considered that the law does not provide that OCGA § 16-10-1, Violation of Oath by a Public Officer, is an "inherently dangerous felony."  OCGA § 16-10-1, therefore, cannot serve as the predicate felony to support a charge of Felony Murder (OCGA § 16-5-1).  See *Wilson v. State*, 315 Ga. 728 (2023). Further, no caselaw supports using Violation of Oath by a Public Officer as a predicate felony for Felony Murder. The case provided by the State, *Eubanks v. State*, 317 Ga. 563 (2023), is distinguishable insofar as the Violation of Oath by Public Officer is not dangerous per se as the examples provided in that case: distribution of narcotics or possession of a firearm by a convicted felon.  Id. at 568– 69.
>
> Count 3 of the indictment, therefore, does not legally suffice to charge any crime.

---

[3] On December 30, 2021, Lewis filed a special demurrer to the indictment, later adopted by Phillips, on the ground that it failed to place him on notice as to what conduct he must defend against.  On September 12, 2023, Lewis filed a general demurrer to Count 3 on the ground that violation of oath of office is not an inherently dangerous felony and cannot serve as a predicate for felony murder.  Shortly thereafter, Phillips filed, in a single filing, a general and special demurrer to Count 3 and a general and special demurrer to Count 7 (violation of oath statute), arguing that the allegations of Count 7 were unclear, did not set forth a crime, and was imperfect in form and substance. The other officers adopted Phillips's demurrers for the counts pertaining to each of them.  On September 10, 2024, the trial court granted the officers' general demurrer to Count 3, which is the subject of this appeal. On November 22, 2024, the trial court denied Lewis and Phillips's special demurrer to the entire indictment, holding that the defendants were adequately informed and that they were each charged individually and as parties to the crimes.  On that same date, the trial court entered a separate "Order Denying Special Demurrer to Counts 5 Through 9."

2. On appeal, the State argues that the trial court erred because under the circumstances of this case, the alleged violations of the officers' oaths created a foreseeable risk of death such that their violations were inherently dangerous as defined by our case law and thus the trial court erred in concluding otherwise. We agree.

"This Court reviews a trial court's ruling on a general ... demurrer de novo in order to determine whether the allegations in the indictment are legally sufficient." *Budhani v. State*, 306 Ga. 315, 319 (2019) (cleaned up). "A general demurrer challenges the sufficiency of the substance of the indictment, and asks whether it is capable of supporting a conviction." Id. (cleaned up). "The general demurrer must be granted if the indictment fails to either (1) 'recite the language of the statute that sets out all the elements of the offense charged' or (2) 'allege the facts necessary to establish a violation of a criminal statute.'" *Moss v. State*, 2025 WL 2918922 (Case No. S25A0650) at *7 __ Ga. __ (Oct. 15, 2025) (quoting *Powell*

7

*v. State*, 318 Ga. 875, 880 (2024)); *see also State v. Wyatt*, 295 Ga. 257, 260 (2014) ("[A]n indictment couched in the language of the statute alleged to have been violated is not subject to a general demurrer.") (citation and quotation marks omitted). We have observed that:

> the most helpful way to assess whether an indictment withstands a general demurrer is to ask if the accused could admit each and every fact alleged in the indictment and still be innocent of any crime. If so, the indictment is subject to a general demurrer. If, however, the admission of the facts alleged would lead necessarily to the conclusion that the accused is guilty of a crime, the indictment is sufficient to withstand a general demurrer.

*Budhani*, 306 Ga. at 319. (cleaned up). In reviewing a general demurrer, "the indictment is read as a whole." *Daniels v. State*, 302 Ga. 90, 99 (2017) (cleaned up), overruled on other grounds by *State v. Lane*, 308 Ga. 10 (2020).

The felony murder statute does not by its terms limit the type of felony that can qualify as a predicate. See OCGA § 16-5-1 ("A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being

8

irrespective of malice.").  Instead, the "inherently dangerous felony" rule is something we adopted in decisional law, reasoning that "the statute is no more than a codification of the felony murder doctrine under the common law" and that the statute's "purpose is the same: to deter the commission of a dangerous or life-threatening felony." *Ford v. State*, 262 Ga. 602, 603 & n.2. (1992).  Relying on *Kansas v. Goodseal*, 220 Kan. 487 (1976), we then concluded that because the "only rational function of the felony murder rule is to furnish an added deterrent to the perpetration of felonies, which, by their nature or by the attendant circumstances, create a foreseeable risk of death," possession of a firearm by a convicted felony is a "status felony" that is not "inherently dangerous" and that "under these circumstances which involve no assault nor any other criminal conduct, is not a felony upon which a felony murder conviction may be obtained." *Ford*, 262 Ga. at 603.

Some years later, Justice Nahmias criticized *Ford*'s reasoning because "[i]t is questionable whether there was a common-law felony murder doctrine in 1811 [when Georgia first adopted a felony

9

murder statute]." *Shivers v. State*, 286 Ga. 422, 425 (2010) (Nahmias, J., concurring specially) (quoting Guyora Binder, *The Origins of American Felony Murder Rules*, 57 Stan. L. Rev. 59, 63 (2004) ("Americans did not receive any felony murder rules from England, for the simple reason that there was no common law felony murder rule at the time of the American Revolution.")). Moreover, in recent years, this Court has made clear that statutory construction should focus on the original public meaning of the statutory text, rather than whatever policy goal we imagine the statute to have been intended to serve. See *Fleureme v. City of Atlanta*, 322 Ga. 180, 181 (2025) ("We interpret legal text according to its original public meaning: the meaning that the public would have understood that language to carry at the time it was enacted."); *Patton v. Vanterpool*, 302 Ga. 253, 258 & n.9 (2017). However, putting aside the debate over *Ford* and its reasoning, no party has asked us to overrule the "inherently dangerous felony" rule as we

10

articulated it in *Ford* and its progeny.[4]

Turning therefore to the "inherently dangerous felony" rule precedent, we stated clearly and recently that "[*a*]*ny felony* can be a predicate for felony murder so long as it is 'inherently dangerous to human life,'" which, in this context, we have explained "mean[s] that it is 'dangerous per se' or 'by its circumstances create[d] a foreseeable risk of death.'"[5] *Wilson*, 315 Ga. at 733 (emphasis supplied) (quoting *Davis v. State*, 290 Ga. 757, 760 (2012) ("The only limitation on the type of felony that may serve as an underlying felony for a felony murder conviction is that the felony must be inherently dangerous to human life. That is, the felony must be dangerous per se or by its circumstances create a foreseeable risk of death." (citation and punctuation omitted))). We have also

---

[4] We express no opinion whether the inherently dangerous felony rule as enunciated in *Ford* and its progeny should be reconsidered.

[5] We recognize that the term "inherently dangerous felony" is a misnomer under our case law because a felony can be considered "inherently dangerous" for purposes of serving as the predicate to felony murder when it is not "inherently dangerous" as that term is commonly understood. See Merriam-Webster, https://www.merriam-webster.com/dictionary/inherent (defining "inherent" as "belonging to the basic nature of something or someone; involved in the constitution or essential character of something; intrinsic") (last accessed Nov. 10, 2025).

explained that "[i]n determining whether a felony meets that definition, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed." *Sanders v. State*, 313 Ga. 191, 198 (2022) (citation and punctuation omitted). More recently still, we explained:

> Felonies may be considered inherently dangerous if they either are "dangerous per se," or "by their circumstances create a foreseeable risk of death." Id. (citation and punctuation omitted); see *Davis*, 290 Ga. at 760. Some felonies, like aggravated assault, create a foreseeable risk of death under almost any circumstances. See *Sanders*, 313 Ga. at 198–99; see also, e.g., *Lofton v. State*, 309 Ga. 349, 353 (2020) (armed robbery); *State v. Tiraboschi*, 269 Ga. 812, 813 (1998) (felony fleeing). Others may or may not create a foreseeable risk of death, depending on how they were committed. See *Ford*, 262 Ga. at 603 (explaining that possession of a firearm by a previously convicted felon is not dangerous per se, but that "circumstances may well exist under which such a felony may be considered dangerous").

*Eubanks*, 317 Ga. at 568–69 (cleaned up).

No party contends that violation of oath by public officer is a felony that is dangerous per se or that it creates a foreseeable risk of death under any circumstances. The question is whether

12

violation of oath by public officer may ever be considered a felony that creates a reasonably foreseeable risk of death depending on the circumstances.

Although this Court has not addressed whether the specific felony offense of violation of oath by public officer may serve as the predicate for a charge of felony murder, we have considered whether other felonies that we have said are neither dangerous per se, nor create a foreseeable risk of death under "almost any circumstances," nonetheless may create a foreseeable risk of death under the specific circumstances presented in a case.

One of the most common fact patterns in which we have considered whether a felony is inherently dangerous involves the offense of possession of a firearm by a convicted felon. Although we have said in *Ford* that possession of a firearm by a convicted felon is a "status felony" that is not "inherently dangerous," *Ford*, 262 Ga. at 602, we nonetheless have concluded that the offense may be considered inherently dangerous depending on the circumstances. Some of those situations involved manipulating a loaded gun near

13

other people and pointing it at them. See *Moon v. State*, 311 Ga. 421, 425 (2021) (holding, where appellant "manipulated a loaded handgun in close proximity to other people in the same room, including a child; pointed the gun at [the victim's] head at some point before she was shot; continued manipulating the gun after repeatedly being told to stop; and admittedly engaged in this conduct after smoking marijuana," that "[w]e have no trouble concluding that, based on the facts of this case, [appellant's] conduct in possessing the gun while being a convicted felon was inherently dangerous"); *Metts v. State*, 270 Ga. 481, 482–83 (1999) (holding that under *Ford*, the "status felony" of being a convicted felon in possession of a firearm, although not always dangerous, was sufficient to support appellant's felony murder conviction under the circumstances where appellant "pointed a loaded, cocked gun in the direction of a window, on the other side of which he knew there was a human being"). In another case, we have said that firearm possession while drinking and shooting at an object that was not positively identified can be considered inherently dangerous under

14

the circumstances. See *Hines v. State*, 276 Ga. 491, 493 (2003) (rejecting appellant's claim that possession of a firearm by a convicted felon, which was being used for turkey hunting, could not support felony murder because "[d]epending on the facts, possession of a firearm by a convicted felon can be an inherently dangerous felony," and was under the circumstances, where appellant was drinking while hunting and took an unsafe shot at a target he had not positively identified as a turkey). And in *Ford*, we explained that if the firearm possession involved an assault or other criminal conduct, that offense under the circumstances could create a foreseeable risk of death. *Ford*, 262 Ga. at 602–03 (holding that possession of a firearm by a convicted felon was not "inherently dangerous" when the defendant was attempting to unload a pistol, but in that process the weapon fired through the floor of the apartment, where it struck the victim, of whom the defendant was unaware).[6]

---

[6] Other than *Ford*, we are not aware of any other case where this Court has held that the predicate felony to a felony murder charge did not meet the requirements of the "inherently dangerous felony" rule.

15

These cases show that it was not the defendants' status as convicted felons—or even as convicted felons in possession of firearms—that was the determining factor in whether the offense of felon in possession of a firearm could serve as the predicate felony for a charge of felony murder. Instead, consistent with how we have articulated the "inherently dangerous felony" rule, the determining factor was *how* the defendants committed that predicate felony and whether there was a foreseeable risk of death under those circumstances. See also *Eubanks*, 317 Ga. at 574 ("So too with drug-possession felonies. In the abstract, simple possession of drugs may not be per se dangerous to human life, but our precedent is clear that a person can possess an illegal substance under circumstances that create a foreseeable risk of death."); *Turner v. State*, 281 Ga. 487, 488–89 (2007) (holding that felony possession of a stolen automobile offense supported conviction for felony murder based on an automobile collision while fleeing from police a few days after the vehicle was stolen because it created a foreseeable risk of death under the circumstances of that case).

According to our case law, therefore, a felony that is not inherently dangerous per se—which includes the felony of violation of oath by public officer—may be considered inherently dangerous, depending on whether the circumstances of its commission created a foreseeable risk of death. Here, the indictment is "couched in the language of the statute alleged to have been violated." *Wyatt*, 295 Ga. at 260. Count 3 of the indictment alleges that the officers committed "the offense of FELONY MURDER (O.C.G.A. 16-5-1), in that" they "while in the commission of the offense of Violation of Oath by Public Officer, a felony, did cause the death of Fernando Rodriguez, a human being, by asphyxiating him, contrary to the laws of said State, the peace, good order, and dignity thereof." Counts 5 through 9, in turn, lay out specific factual allegations supporting that charge, alleging that the officers violated their oaths "to protect and serve the citizens … in a courteous and professional manner and to support the Constitution of the United States and the State of Georgia," and that they did so "by asphyxiating [] Rodriguez by stretching [him] out [] on the ground in a prone

17

position, holding him down and applying pressure to his body, contrary to the laws of said State, the peace, good order, and dignity thereof."[7]  Nothing in these factual allegations preclude a jury from concluding that the circumstances alleged created a reasonably foreseeable risk of death.  The trial court therefore erred in granting the officers' general demurrer on Count 3 on the ground that the alleged violations of oath by public officer do not constitute inherently dangerous felonies.[8]

---

[7] In reviewing a general demurrer to an indictment, we consider whether "the accused could admit *each and every fact alleged in the indictment* and still be innocent of any crime." *Budhani*, 306 Ga. at 319 (emphasis supplied).  We also note that although the State is not generally required "to allege any additional facts in the indictment beyond the statutory elements" to withstand a general demurrer, that does not prevent this Court from considering additional factual allegations contained within "the four corners of the indictment" in assessing a general demurrer.  *Powell*, 318 Ga. at 879, 882 ("read[ing] the indictment as a whole" and concluding that "where the details provided in each count actually *negate* the elements of the crimes charged, the indictment is not sufficient to withstand a general demurrer because [the defendants] can admit each and every fact alleged in the indictment and still be innocent of the crimes alleged by the State") (citations and quotation marks omitted).  Thus, in considering whether the trial court properly granted the officers' general demurrer to Count 3, we also may consider the factual allegations supporting the separate counts of violation of oath by public officer in Counts 5 through 9.

[8] The officers, as Appellees, urge us to reconsider the trial court's denials of their other motions for general and special demurrers on Count 3 and Counts 5 through 9, but as noted above, this Court already denied applications for

18

*Judgment vacated and case remanded. All the Justices concur.*

interlocutory appeal on those issues. Because these rulings have not been enumerated as error in this appeal, we decline to address these arguments, and we take no position on their merits in this opinion. Importantly, however, it does not appear that the trial court has yet ruled on general demurrers that challenge Counts 3 and 5 through 9 on the ground that the allegations therein fail to allege adequately the crime of violation of oath by public officer. We express no opinion as to the merits of Appellees' arguments on that point, given the lack of any ruling below for us to review, and remand for the trial court to consider these demurrers and arguments in the first instance.

PETERSON, Chief Justice, concurring.

I concur in the majority's holding that the trial court erred in granting the officers' general demurrer to Count 3. But, as the majority points out, the officers also brought general demurrers to Counts 5 through 9, which charge the officers with violating their respective oaths under OCGA § 16-10-1. The record before us indicates that the trial court has yet to rule on those general demurrers. I write separately to point out that those demurrers may warrant granting.

The language in Counts 5 through 9 of the indictment, and in the officers' oaths, which requires officers "to protect and serve the citizens … in a courteous and professional manner," may prove problematic, as it is not clear that language is "prescribed by law" under OCGA § 16-10-1.

Counts 5 through 9 alleged that the officers:

being [ ] public officer[s] with the [Hampton or Henry County] Police Department … who swore to protect and serve the citizens … in a courteous and professional manner and to support the Constitution of the United States and the State of Georgia, did willfully and

20

intentionally violate the terms of [their] oath[s] as prescribed by law, by asphyxiating Fernando Rodriguez by stretching out Fernando Rodriguez on the ground in a prone position, while he was handcuffed and shackled, holding him down and applying pressure to his body, contrary to the laws of said State, the peace, good order, and dignity thereof.

Relevant to the charges here, OCGA § 16-10-1 makes it a felony for a public officer to "willfully and intentionally violate[] the terms of his oath *as prescribed by law*[.]" OCGA § 16-10-1 (emphasis added).[9] The plain language of the statute thus provides that for a violation of the terms of an oath to support criminal liability under the statute, those terms must be prescribed by law. This conclusion was reflected by the Court of Appeals in *Bradley v. State*, 292 Ga. App. 737 (2008). There, the Court of Appeals concluded that "[t]o prove a violation of this Code section, the State must present evidence that the defendant violated the terms of the oath actually administered and that those terms were from an oath 'prescribed by law,' that is, one that the 'legislature' required of a public officer

---

[9] As the majority notes, this part of OCGA § 16-10-1 was in effect at the time the officers were indicted, but the statute was amended in 2025 to add subparts.

21

'before entering the duties of [his or her] office.'" Id. at 740 (quoting *Jowers v. State*, 225 Ga. App. 809, 810–12 (1997)).

The State alleges that the officers violated two provisions of their oaths: an oath to protect and to serve the people of the City of Hampton or Henry County "in a courteous and professional manner" and an oath to "support the Constitution of the United States and of the State of Georgia."

The language alleged in the indictment that the officers failed "to protect and serve the citizens … in a courteous and professional manner" bears no resemblance to any oath prescribed by any statute of which I am aware, and thus seems likely not to be "prescribed by law." In particular, the officers argue that OCGA § 45-3-1, which does not include the "courteous and professional manner" language, prescribes the only terms of a peace officer's oath that could be used to support criminal liability in this case.[10] The State has not

---

[10] To the extent the officers argue that they committed the alleged actions with justification, the Court of Appeals has recognized another hurdle the State may have in convicting police officers based on a theory that the officers violated their oaths of office, to the extent that those oaths conflict with the self-defense statute. See *Olsen v. State*, 371 Ga. App. 12, 15–18 (2024).

bothered to respond to that argument.[11]

If that language in the officers' oaths is not prescribed by law, it cannot form the basis for a violation of OCGA § 16-10-1. See *Pierson v. State*, 348 Ga. App. 765, 774–76 (2019) (holding that there was "sufficient evidence to show that the terms of the oath taken by the [defendant] were 'prescribed by law,' as required by OCGA § 16-10-1" where the oath was "almost identical to the oath that sheriffs are required to take, pursuant to OCGA § 15-16-4"); *Bradley*, 292 Ga. App. at 740–41 (upholding conviction where the oath taken by defendant, a correctional officer, was prescribed by law where the oath almost exactly tracked the language of the oath for correctional officers set forth in OCGA § 42-5-31); *Jowers*, 225 Ga. App. at 812 (reversing defendant's conviction for violation of oath by a public officer and noting that the evidence of record reflects that defendant was sworn to uphold the laws of the state, which is a not a term "expressly 'prescribed by law' for the oath which a deputy sheriff

---

[11] The State's opening brief contains only six pages of argument, and the State filed no reply brief at all.

must take").[12]

I am authorized to state that Justice LaGrua joins in this concurrence.

---

[12] There remains one other provision in Counts 5 through 9 and in the officers' oaths that likely *is* statutorily prescribed by law. The indictment alleges that the officers violated their oaths "to support the Constitution of the United States and the State of Georgia." This provision is present in OCGA § 45-3-1(6) — which requires officers to "[s]wear that he or she will support the Constitution of the United States and of this state." But the State makes no argument in this appeal about that language; in fact, the State's brief does not even mention it. Moreover, the conduct alleged would constitute a violation of the officers' oath of office (at least under the United States Constitution) only if the officers' conduct here was unreasonable under the circumstances, such as by using excessive force. See *Graham v. Connor*, 490 US 386, 394–97 (1989). There is no allegation in the indictment that the force was excessive under the circumstances.